## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CHRISTINE MCGOVERAN, JOSEPH  )
VALENTINE, and AMELIA RODRIGUEZ,)
on behalf of themselves and all other  )
persons similarly situated, known  )
and unknown,  )
　　　　　　　　　　　　　　 )
　　　　　　　　Plaintiffs,  )
　　　　　　　　　　　　　　 )
v.  )
　　　　　　　　　　　　　　 )
AMAZON WEB SERVICES, INC. and  )
PINDROP SECURITY, INC.,  )
　　　　　　　　　　　　　　 )
　　　　　　　　Defendants.  )
　　　　　　　　　　　　　　 )

Case No.: 1:20-cv-1399-LPS

Judge: Leonard P. Stark

**JURY TRIAL DEMANDED**

**CLASS ACTION**

## FIRST AMENDED COMPLAINT

　　　　Plaintiffs Christine McGoveran, Joseph Valentine, and Amelia Rodriguez, ("Plaintiffs"),

individually and on behalf of all other persons similarly situated, bring this class action lawsuit

for violations of the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq*. ("BIPA"), against

Defendants Amazon Web Services, Inc. and Pindrop Security, Inc. Plaintiffs allege the following

facts based upon personal knowledge, investigation by retained counsel, and on information and

belief.

### I.　　**Nature of the Action**

　　　　1.　　Plaintiffs allege that Defendants Pindrop Security, Inc. and Amazon Web

Services, Inc. ("Defendants") violated BIPA by collecting, possessing, redisclosing, profiting

from, and failing to safeguard their biometric identifiers and biometric information ("Biometric

Data"). For the reasons discussed in greater detail below, Defendants' violations of BIPA pose a

serious threat of permanent harm in Illinois to Plaintiffs and members of the putative class.

2.       Plaintiffs seek to represent a class of individuals who made one or more phone calls to or received one or more phone calls from call centers, customer service representatives and/or other entities using services offered by Amazon Web Services, Inc., and had their unique, biometric voiceprints collected, possessed, and used by Defendants without their consent or authorization, including through the use of Pindrop's biometric voice authentication technology.

3.       Plaintiffs have suffered significant damage, as more fully described herein, because their Biometric Data has been intercepted, collected, and disseminated without their knowledge or consent, thereby materially decreasing the security of this intrinsically inalterable information, and substantially increasing the likelihood that they will suffer as victims of fraud and/or identity theft in the future.

4.       Through this lawsuit, Plaintiffs, on behalf of a similarly situated class, seek to enjoin Defendants from collecting, possessing, and profiting from their Biometric Data in violation of BIPA, and seek to obtain actual and statutory damages for their injuries.

5.       The remedies Plaintiffs seek are remedial, and not penal, in nature.

## II.       Parties

6.       Plaintiff Christine McGoveran is a resident of Wood River in Madison County, Illinois.

7.       Plaintiff Joseph Valentine is a resident of Antioch in Lake County, Illinois.

8.       Plaintiff Amelia Rodriguez is a resident of Chicago in Cook County, Illinois.

9.       Plaintiffs made phone calls to call centers using services provided by Defendant Amazon Web Services ("AWS"); Defendants collected, stored, and used their biometric identifiers and biometric information, as more fully described herein.

10.     Defendant AWS is a Delaware corporation that is registered to and does conduct business throughout Illinois. AWS may be served with process through its registered agent, the Corporation Services Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

11.     AWS is a "private entity" under the meaning of BIPA. *See* 740 ILCS 14/10.

12.     Defendant Pindrop Security, Inc. ("Pindrop") is a Delaware corporation that is registered to and does conduct business throughout Illinois. Pindrop may be served with process through its registered agent, the Corporation Services Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

13.     Pindrop is a "private entity" under the meaning of BIPA. *See* 740 ILCS 14/10.

## III.     Jurisdiction and Venue

14.     This Court has general personal jurisdiction over Defendants because they are both Delaware corporations.

15.     This Court has diversity subject matter jurisdiction over Defendants because the amount in controversy exceeds $75,000 and the dispute is between citizens of different States. 28 U.S.C. §1332 (a)(1). This Court also has subject matter jurisdiction under 28 U.S.C. §1332 (d)(2)(A) because this is a civil class action in which the amount in controversy exceeds $5,000,000, and at least one Class Member is a citizen of a State different from at least one Defendant.

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

## IV.     The Biometric Information Privacy Act

17.     "Biometrics" refers to "biology-based set[s] of measurements." *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1094 (N.D. Ill. 2017). Specifically, "biometrics" are "a set of measurements of a specified physical component (eye, finger, voice, hand, face)." *Id.* at 1096.

18.     BIPA was enacted in 2008 in order to safeguard biometric information as the result of the "very serious need [for] protections for the citizens of Illinois when it [comes to their] biometric information." Illinois House Transcript, 2008 Reg. Sess. No. 276. BIPA is codified as Act 14 in Chapter 740 of the Illinois Compiled Statutes.

19.     As set forth in BIPA, biologically unique identifiers, such as voiceprint information, cannot be changed. 740 ILCS 14/5(c). As is likewise set forth in BIPA, the inalterable nature of biologically unique identifiers presents a heightened risk when biometric information is not protected in a secure and transparent fashion. 740 ILCS 14/5(d)–(g).

20.     As a result of the need for enhanced protection of biometric information, BIPA imposes various requirements on private entities that collect or maintain individuals' biometric information, including voiceprints.

21.     Among other things, BIPA seeks to regulate "the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 ILCS 14/5(g).

22.     BIPA applies to entities that interact with two forms of Biometric Data: biometric "identifiers" and biometric "information." 740 ILCS 14/15(a)–(e).

23.     "Biometric identifiers" are physiological, as opposed to behavioral, characteristics. Examples include, but are not limited to, voiceprints, face geometry, fingerprints, DNA, palmprints, hand geometry, iris patterns, and retina patterns. As the Illinois General Assembly has explained:

> Biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric facilitated transactions.

740 ILCS 14/5(c). Moreover,

> A person cannot obtain new DNA or new fingerprints or new eyeballs for iris recognition, at least not easily or not at this time. Replacing a biometric identifier is not like replacing a lost key or a misplaced identification card or a stolen access code. The Act's goal is to prevent irretrievable harm from happening and to put in place a process and rules to reassure an otherwise skittish public. *Sekura v. Krishna Schaumburg Tan, Inc.*, 2018 IL App (1st) 180175, ¶ 59, 115 N.E.3d 1080, 1093, appeal denied, 119 N.E.3d 1034 (Ill. 2019). A "biometric identifier" is defined by BIPA as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10.

24.     BIPA's text provides a non-exclusive list of protected "biometric identifiers," including "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. In this case, the biometric identifiers at issue are the voiceprints of individuals, including Plaintiffs, intercepted by Defendants without any notice to or consent from the individuals whose biometric identifiers are collected.

25.     "Biometric information" consists of biometric identifiers used to identify a specific person. "Biometric information" is defined by BIPA as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id*. This definition helps ensure that information based on a biometric identifier that can be used to identify a person is covered by BIPA.

26.     In BIPA, the Illinois General Assembly identified four distinct activities that may subject private entities to liability:

(1)     collecting Biometric Data, 740 ILCS 14/15(b);

(2)     possessing Biometric Data, 740 ILCS 14/15(a);

(3)     profiting from Biometric Data, 740 ILCS 14/15(c); and

(4)     disclosing Biometric Data, 740 ILCS 14/15(d).

BIPA also created a heightened standard of care for the protection of Biometric Data. 740 ILCS

14/15(e).

27.     As the Illinois Supreme Court has held, BIPA "codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information." *Rosenbach v. Six Flags Entm't Corp.*, 2019 IL 123186, ¶ 33, 129 N.E.3d 1197, 1206 (Ill. 2019). The Illinois Supreme Court further held that when a private entity fails to comply with BIPA "that violation constitutes an invasion, impairment, or denial of the statutory rights of any person or customer whose biometric identifier or biometric information is subject to the breach." *Id.*

    A.   <u>Collecting Biometric Data Under Section 15(b).</u>

28.     BIPA imposes three requirements that must be satisfied before any private entity may "collect, capture . . . or otherwise obtain" biometric information:

    (a)   First, the private entity must inform the individual in writing that the individual's biometric information is being collected or stored. 740 ILCS 14/15(b)(1).

    (b)   Second, the private entity must inform the individual in writing of the purpose and length of time for which their biometric information is being collected, stored, and used. 740 ILCS 14/15(b)(2).

    (c)   Finally, the private entity must receive a written release executed by the individual or a legally authorized representative. 740 ILCS 14/15(b)(3).

29.     BIPA defines a "written release," outside the employment context, to mean "informed written consent." 740 ILCS 14/10.

B.      Possessing Biometric Data Under Section 15(a).

30.     BIPA requires that any private entity in possession of Biometric Data develop a public, written policy "establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information." 740 ILCS 14/15(a).

31.     BIPA requires that this public, written policy include information about how the entity will destroy the biometric data upon fulfilling the purpose for its collection or within three years, whichever is later. *Id.*

32.     BIPA requires a private entity in possession of Biometric Data to "comply with its established retention schedule and destruction guidelines," that is, to actually destroy Biometric Data pursuant to its policies. *Id.*

C.      BIPA's Unqualified Prohibition on Profiting from Biometric Data Under Section 15(c).

33.     BIPA additionally bars private entities from profiting from Biometric Data. Section 15(c) provides as follows:

> No private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information.

740 ILCS 14/15(c).

34.     Section 15(c) is an unqualified prohibition on profiting from Biometric Data. Section 15(c) applies to this case, for among other reasons, because Defendants developed, sold, operated, and profited from Plaintiffs' Biometric Data.

35.     BIPA forbids any private entity in possession of a biometric identifier or biometric information from "profit[ing]" from that data. 740 ILCS 14/15(c).

D.    Disseminating Biometric Data Under Section 15(d).

36.    BIPA prohibits the "disclos[ure], redisclos[ure], or other[] disseminat[ion]" of Biometric Data without consent, unless the "disclosure or redisclosure completes a financial transaction" that is requested or authorized by the individual, is required by law, or is required in order to comply with a valid warrant or subpoena. 740 ILCS 14/15(d).

## V.    The Serious Threats Posed by Biometric Data

37.    Voice biometrics—also known as voiceprinting—use biological characteristics to verify an individual's identify.

38.    For example, voice biometrics may be used to confirm the identity of a caller to a customer service agent or a call center.

39.    Operators of call centers and/or customer service operations may, for various reasons, desire to avoid authenticating callers using traditional methods, such as the use of a passcode or answers to secret questions, and instead choose to authenticate callers using voice biometrics, including voiceprints.

40.    When a passcode is used as a security measure, in the event of a data breach an individual may simply change the passcode to prevent unauthorized access to the individual's compromised account. By contrast, when call centers or customer service personnel use voice biometrics for authentication, in the event of a data breach there is nothing an individual can do to prevent someone from using the individual's voice biometrics to gain unauthorized access to the compromised account.

41.     The global voice biometrics market size is expected to grow dramatically—according to one source, from $984 million in 2019 to $2.8 billion by 2024.[1]

42.     "Stolen biometric identifiers . . . can be used to impersonate consumers, gaining access to personal information."[2]

43.     Unlike other identifiers such as Social Security or credit card numbers, which can be changed if compromised or stolen, biometric identifiers linked to a specific voice or face cannot be modified—ever. These unique and permanent biometric identifiers, once exposed, leave victims with no means to prevent identity theft and unauthorized tracking.

44.     Once a person or entity has an individual's Biometric Data:

[T]hey can get your name, they can find your social networking account, and they can find and track you in the street, in the stores that you visit, the . . . buildings you enter, and the photos your friends post online.[3]

45.     Indeed, the Illinois Supreme Court has held that in BIPA the Illinois "General Assembly has codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information." *Rosenbach*, 129 N.E.3d at 1206.

46.     In so holding, the Court explicitly recognized the "difficulty in providing meaningful recourse once a person's biometric identifiers or biometric information has been

---

[1] *Voice Biometrics Market Worth $2,845 Million by 2024*, Cision PR Newswire (May 2, 2019), https://www.prnewswire.com/news-releases/voice-biometrics-market-worth-2-845-million-by-2024---exclusive-report-by-marketsandmarkets-300842635.html, *archived at* https://perma.cc/8WYU-KW9A.

[2] Elias Wright, *The Future of Facial Recognition Is Not Fully Known: Developing Privacy and Security Regulatory Mechanisms for Facial Recognition in the Retail Sector*, 29 Fordham Intell. Prop. Media & Ent. L.J. 611, 629 (2019).

[3] *What Facial Recognition Technology Means for Privacy and Civil Liberties,* Hearing Before the Subcomm. On Privacy Tech & the Law of the S. Comm. On the Judiciary, 112th Cong. 1 (Jul. 18, 2012), at 1, 2, https://www.congress.gov/112/chrg/CHRG-112shrg86599/CHRG-112shrg86599.pdf, *archived at* https://perma.cc/2F9Y-S8HQ (statement of Sen. Al Franken, raising concerns about the implications of the rising use of facial racial recognition technology to the Subcommittee on Privacy, Technology, and the Law).

compromised." *Id*. As it further held, "[t]he situation is particularly concerning, in the legislature's judgment, because [t]he full ramifications of biometric technology are not fully known.'" *Id*. (citing BIPA).

47.     The use of Biometric Data "leads to the fear that a data breach or sale by one holder of a piece of a person's biometric information would compromise the security of all relationships that are verified by that same piece."[4]

48.     This fear is not based on mere conjecture. Biometric Data has been illicitly targeted by hackers. For example, a security firm recently uncovered a "major breach" of a biometric system used by banks, police, defense firms, and other entities.[5] This breach involved exposure of extensive biometric and other personal data, including facial recognition data and fingerprints. *Id*.

49.     Even anonymized Biometric Data poses risks. For example, according to a recent report:

> In August 2016, the Australian government released an "anonymized" data set comprising the medical billing records, including every prescription and surgery, of 2.9 million people. Names and other identifying features were removed from the records in an effort to protect individuals' privacy, but a research team from the University of Melbourne soon discovered that it was simple to re-identify people, and learn about their entire medical history without their consent, by comparing the

---

[4] Matthew B. Kugler, *From Identification to Identity Theft: Public Perceptions of Biometric Privacy Harms*, 10 UC Irvine L. Rev. 107, 132 (2019).

[5] Josh Taylor, *Major Breach Found in Biometrics System Used by Banks, UK Police and Defence Firms*, The Guardian (Aug. 14, 2019), https://www.theguardian.com/technology/2019/aug/14/major-breach-found-in-biometrics-system-used-by-banks-uk-police-and-defence-firms, *archived at* https://perma.cc/A848-6JMM (reporting that the "fingerprints of over 1 million people, as well as facial recognition information…was discovered on a publicly accessible database").

dataset to other publicly available information, such as reports of celebrities having babies or athletes having surgeries.[6]

Indeed, "[t]here is a growing skepticism in the field of data protection and privacy law that biometric data can never truly be deidentified or anonymized."[7]

## VI.   Defendants Violated BIPA and Exposed Plaintiffs to Serious Harms

    A.   Defendants' Collection, Possession, and Use of Illinois Citizens' Biometric Data.

       1.   *AWS's "Amazon Connect" Cloud-Based Call Center Services*

50.   "It has long been a standard practice for businesses of all sizes to operate contact centers, thereby allowing customers to ask questions with a live agent[.]"[8]

51.   AWS offers call center services under the brand "Amazon Connect."

52.   Amazon Connect is a "cloud-based contact center service."[9] Amazon Connect facilitates customer service calls between Illinois citizens and "agents who are located anywhere."[10]

---

[6] Olivia Solon, *'Data Is A Fingerprint': Why You Aren't as Anonymous As You Think Online*, The Guardian (Jul. 13, 2018), https://www.theguardian.com/world/2018/jul/13/anonymous-browsing-data-medical-records-identity-privacy, *archived at* https://perma.cc/CD9K-GQ7T ("So-called 'anonymous' data can be easily used to identify everything from our medical records to purchase histories").

[7] Justin Banda, *Inherently Identifiable: Is It Possible To Anonymize Health And Genetic Data?*, International Association of Privacy Professionals Privacy Perspectives (Nov. 13, 2019), https://iapp.org/news/a/inherently-identifiable-is-it-possible-to-anonymize-health-and-genetic-data/, *archived at* https://perma.cc/E5VZ-2YNJ.

[8] 4 Evaluation Essentials for Personalizing and Innovating Your Customer Service https://pages.awscloud.com/rs/112-TZM-766/images/ SMB_4_Evaluation_Essentials_eBook_connect.pdf, *archived at* https://perma.cc/2USW-J4TM.

[9] Introducing Amazon Connect (Mar. 28, 2017), https://aws.amazon.com/about-aws/whats-new/2017/03/introducing-amazon-connect/, *archived at* https://perma.cc/ZJ2W-DUVM.

[10] 2020 Amazon Connect Administrator Guide, https://web.archive.org/web/20200507011611/http://docs.aws.amazon.com/connect/latest/admin guide/connect-ag.pdf at 7, *archived at* https://perma.cc/3WZP-8SMY, at 1.

53.     A cloud-based system, such as Amazon Connect, involves the delivery of services through the internet.[11] Accordingly, AWS, through Amazon Connect, delivers services through the internet.[12]

54.     The nature of a cloud-based system is that the precise location of data is uncertain.[13] However, data in a cloud-based system is commonly routed to nearby servers.[14]

55.     AWS, through Amazon Connect, "manages the telephony infrastructure" for businesses and other clients that operate contact centers.[15] Among other things, AWS manages the routing of Illinois citizens' telephone calls, as well as carrier connections for Illinois citizens' calls and "redundancy," which ensures that there are multiple "routes" available for Illinois citizens' data controlled by AWS.[16]

56.     In connection with its operation of Amazon Connect, AWS possesses and stores a variety of types of data, including the Biometric Data of Illinois citizens, as described in greater detail below.

  2.   *Pindrop's Voice Biometric Services*

---

[11] https://www.investopedia.com/terms/c/cloud-computing.asp, *archived at* https://perma.cc/7PRD-836Z.

[12] 2020 Amazon Connect Administrator Guide, https://web.archive.org/web/20200507011611/http://docs.aws.amazon.com/connect/latest/admin guide/connect-ag.pdf at 262, 389, *archived at* https://perma.cc/3WZP-8SMY.

[13] Barry Sosinsky, *Cloud Computing Bible* at 4 (in cloud computing systems, "data is stored in locations that are unknown" and 17 ("Intrinsic" to the resource pooling characteristic of cloud computing "is the idea of abstraction that hides the location of resources."), *archived at* https://perma.cc/C492-WL22.

[14] *Id*. at 216 (describing how a service provider lowers latency by delivering content to users who are nearby its servers); AWS Global Infrastructure, https://aws.amazon.com/about-aws/global-infrastructure, *archived at* https://perma.cc/KAF9-HURT (advertising that AWS provides lower latency by having many servers which may be closer to end-users).

[15] 2020 Amazon Connect Administrator Guide, https://web.archive.org/web/20200507011611/http://docs.aws.amazon.com/connect/latest/admin guide/connect-ag.pdf at 262, 389, *archived at* https://perma.cc/3WZP-8SMY, at 7–8.

[16] *Id*.

57.     Pindrop offers voice biometric services.

58.     Pindrop's voice biometric services are used by call centers and customer service personnel to, among other things, confirm the identity of individual callers, including Illinois citizen callers.

59.     Pindrop advertises products and services that confirm the identity of the speaker by voice.[17]

60.     Pindrop describes its services as being able to "authenticate callers" by "extract[ing] . . . intelligence from every call encountered."[18]

61.     Pindrop's "Deep Voice" product uses "biometrics" to "identify[] and analyz[e] repeat callers."[19]

62.     Similarly, Pindrop's "Phoneprinting" product analyzes call audio to "create a distinctive identifier for each caller."[20]

63.     Pindrop charges fees for and profits from the biometric voice products and services it offers, including those described herein.

      3.   *The Integration of Amazon Connect with Pindrop's Voice Biometric Services*

64.     AWS partners with various software developers and service providers to offer to Amazon Connect customers add-ons that provide additional functionality to Amazon Connect.

---

[17] Pindrop website homepage, https://www.pindrop.com, *archived at* https://perma.cc/X5XJ-KGLR.

[18] Amazon Connect Pindrop Integration Guide ("Integration Guide"), at 3, *archived at* https://perma.cc/5C26-JM4F. ("Analytics for contact center security in the AWS Cloud"), attached hereto as Exhibit 1.

[19] Deep Voice for Speaker Identification, https://www.pindrop.com/technologies/deep-voice/, *archived at* https://perma.cc/3XLG-S24Y.

[20] About Phoneprinting Technology, https://www.pindrop.com/resources/video/video/about-phoneprinting-technology/, *archived at* https://perma.cc/UK2R-25FN.

65.     AWS advertises that Amazon Connect is capable of "integrat[ing] with a broad set of AWS tools and infrastructure[.]"[21]

66.     AWS and Pindrop publicly advertise the availability of a Pindrop "integration with Amazon Connect[.]"[22]

67.     Pindrop, in a November 27, 2017 press release, touted that it was "one of the first" partners with AWS in launching the "new Amazon Connect offering."[23] Further, Pindrop asserted that its integration with Amazon Connect was "native," meaning that its technology "integrate[s] seamlessly with Amazon Connect."[24]

68.     Pindrop's biometric voice authentication services are offered by AWS to Amazon Connect customers.

69.     The current version of Amazon Connect has "Voice ID" built in.[25] This feature enables AWS, via Amazon Connect, to use voice biometric information to authenticate Illinois citizens and other callers without the use of a plugin such as that offered by Pindrop.[26] AWS thereby uses voice Biometric Data, which it directly captures from Illinois citizens, to authenticate Illinois citizens itself. [27]

---

[21] Introducing Amazon Connect, https://aws.amazon.com/about-aws/whats-new/2017/03/introducing-amazon-connect/ *archived at* https://perma.cc/H5UA-46C6.
[22] Integration Guide at 1.
[23] Amazon Connect Certifies Pindrop's Security and Authentication Technology (Nov. 27, 2017), https://www.businesswire.com/news/home/20171127005113/en/Amazon-Connect-Certifies-Pindrops-Security-Authentication-Technology, *archived at* https://perma.cc/4FR8-WEXX.
[24] *Id.*
[25] Amazon Connect Administrator Guide, https://docs.aws.amazon.com/connect/latest/adminguide/connect-ag.pdf, *archived at* https://perma.cc/S6SW-SH57.
[26] *Id.*
[27] *Id.*

70.     In or around December 2020, after Plaintiffs filed their initial complaint, AWS added to its terms of service a requirement that Amazon Connect subscribers using Amazon Connect Voice ID in Illinois ensure compliance with BIPA.[28]

      4.   *Defendants' Collection, Possession, and Dissemination of Illinois Citizens' Biometric Data*

71.     AWS, using Amazon Connect, routes Illinois citizens' voice audio spoken in Illinois in real time (i.e., while Illinois citizens are speaking words in Illinois) through AWS's network of servers.[29]  No intermediary captures Illinois citizens' audio on behalf of AWS; instead, AWS reaches into Illinois to captures Illinois citizens' voice audio itself, *directly* from Illinois citizens' words vocalized in Illinois.[30]

72.     By routing Illinois citizens' voice audio spoken in Illinois through its network of servers, AWS captures "customer audio for the entire interaction with [a] contact center."[31] In other words, AWS reaches into Illinois to capture voice audio spoken in Illinois *directly* from Illinois citizens, and AWS then routes this audio through AWS's server network.

73.     AWS has additionally built into its Amazon Connect system the ability to *analyze* Illinois citizens' voice audio spoken in Illinois in real time.[32]

74.     Amazon Connect has additional functionality that enables Illinois citizens to navigate a system of menus using voice commands.[33]

---

[28] 2020 AWS Service Terms, https://web.archive.org/web/20201203145433/https://aws.amazon.com/service-terms/, *archived at* https://perma.cc/WQ8U-VAE6.
[29] 2020 Amazon Connect Administrator Guide, https://web.archive.org/web/20200507011611/http://docs.aws.amazon.com/connect/latest/admin guide/connect-ag.pdf, *archived at* https://perma.cc/3WZP-8SMY, at 3.
[30] *Id*.
[31] *Id*. at 445.
[32] *Id*. at 3, 14, 121, 158, 162, 166, 168, 191.
[33] *Id*. at 265–67.

75.     In this way, Amazon Connect is similar to other internet-based systems, such as websites.[34] As Illinois citizens would when interacting with a website, Illinois citizens interacting with Amazon Connect interact *directly* with AWS's cloud-based system by entering commands and/or providing information.[35] AWS, through Amazon Connect, then provides information to the Illinois citizen responsive to his or her commands and/or information.[36]

76.     With a website, such as, for example, Facebook.com or Google.com, commands are issued by the user by typing, tapping a touchscreen, or clicking a mouse. With a telephone contact center, such as Amazon Connect, commands are issued by a user by making verbal utterances.[37] In either scenario, the user *directly* interacts with the system and its operator (in this case, AWS); the difference is simply the mechanism of interface.

77.     When integrated with Amazon Connect, Pindrop's voice authentication service relies on real-time transmission of voice audio from the caller, wherever that caller is located, to Pindrop's servers.[38]

78.     AWS and Pindrop describe this integration with the following diagram:

---

[34] Barry Sosinsky, *Cloud Computing Bible*, *archived at* https://perma.cc/C492-WL22, at 15 (listing cloud-based call center operations among other cloud-based services such as websites).

[35] *See* 2020 Amazon Connect Administrator Guide, https://web.archive.org/web/20200507011611/http://docs.aws.amazon.com/connect/latest/admin guide/connect-ag.pdf at 18, *archived at* https://perma.cc/3WZP-8SMY (describing how customers interact with the system by navigating through the system based on commands entered via their phone, or using interactive voice response).

[36] *See, e.g., id.*, at 142, 154, 158, 169, 238, 243, 268 (describing various messages and information the system delivers to callers in response to their inputs).

[37] *Id.* at 18 (describing how customers interact with the system by navigating through the system based on commands entered via their phone, or using interactive voice response).

[38] *Id.* at 3, 14, 121, 158, 162, 166, 168, 191 (describing AWS's real-time analysis of calls through Amazon Connect); Pindrop Passport + Protect User Guide, https://enterprise.verizon.com/service_guide/secure/passport_and_protect_user_guide.pdf, *archived at* https://perma.cc/6PC4-M7NS, at 4 ("Instant and continuous scoring of every call[.]") (emphasis added).



79.     Pindrop describes the above figure as a "[d]ataflow diagram of Pindrop architecture within Amazon Connect."[39] As the diagram shows, and as numerous publicly available documents confirm, Pindrop's biometric data services consist not solely of software or hardware solutions sold to customers for their independent use; instead Pindrop offers cloud-based biometric services that Pindrop *itself* performs, and which require Pindrop *itself* to process and analyze Illinois citizens' Biometric Data that Pindrop directly accesses in real time as Illinois citizens make biologically unique sounds while located in Illinois.[40]

---

[39] Integration Guide at 1.

[40] *See, e.g.*, Pindrop Protect Product Description, https://enterprise.verizon.com/service_guide/secure/pindrop_protect_product_description.pdf, *archived at* https://perma.cc/6YRM-8XWW, at 10, 13, 15, 16; Pindrop Authentication, https://web.archive.org/web/20190309150502/https://www.pindrop.com/solutions/authentication ("During a caller's interaction with the call center, the IVR [(interactive voice response)] or agent software can confirm the identity of the caller at any point via an API [(application programming interface)] request to the Pindrop cloud."); Pindrop Passport User Guide, https://enterprise.verizon.com/service_guide/secure/passport_user_guide.pdf, at, *e.g.*, 4 (describing Pindrop's "Passport" voice biometric offering as a "service"), *archived at* https://perma.cc/ZGB7-E75X; Pindrop Protect User Guide, https://enterprise.verizon.com/service_guide/secure/protect_user_guide.pdf, *archived at* https://perma.cc/S28R-BL74, at, *e.g.*, 8 (describing Pindrop's "Protect" voice biometric offering as a "service").

80.     As the above diagram, and other publicly available documents cited herein demonstrate, Pindrop continuously receives biologically unique voice audio, which Defendants reach into Illinois to capture, from incoming calls made by Illinois citizens while vocalizing words in Illinois.[41] After receiving this biologically unique voice audio, Pindrop disseminates Biometric Data generated from it to AWS's server network in real time while calls with Illinois citizens are ongoing. This Biometric Data is then used to authenticate Illinois citizens during their phone calls from Illinois, while they are speaking words in Illinois.[42] In this manner, Defendants use words spoken by Illinois citizens in Illinois, which Defendants reach into Illinois to capture, to uniquely identify Illinois citizens.

81.     Pindrop advertises that its services are "cloud-based."[43] In other words, Pindrop hosts Plaintiffs' and the Class's Biometric Data on Defendants' servers.

82.     Indeed, Pindrop stated on its website that its services "eliminate the need to purchase and deploy an extensive hardware infrastructure—allowing enterprises to avoid operational and capital expenditure historically tied to on-premises equipment[]."[44]

---

[41] *See, e.g.*, Pindrop Protect User Guide at 1, https://enterprise.verizon.com/service_guide/secure/protect_user_guide.pdf, *archived at* https://perma.cc/S28R-BL74 (advertising "continuous scoring of every call based on fraud risk").

[42] *Id.*

[43] *See, e.g.*, Pindrop Protect Product Description, https://enterprise.verizon.com/service_guide/secure/pindrop_protect_product_description.pdf, *archived at* https://perma.cc/6YRM-8XWW, at 10, 13, 15, 16; Pindrop Authentication, https://web.archive.org/web/20190309150502/https://www.pindrop.com/solutions/authentication /, *archived at* https://perma.cc/S6AM-CEN8 ("During a caller's interaction with the call center, the IVR [interactive voice response] or agent software can confirm the identity of the caller at any point via an API [application programming interface] request to the Pindrop cloud.").

[44] Pindrop website, *Passive, Multi-Factor Authentication*, https://www.pindrop.com/ solutions/authentication/, *archived at* https://perma.cc/WAG2-HBNF (asserting Pindrop's "passive, multi-factor authentication" helps contact centers authenticate "legitimate callers quickly and accurately" while reducing "call handle times").

83. The analysis of words spoken by Illinois citizens in Illinois to extract Biometric Data takes place at least in part on Defendants' server network, and is done via biometric voice technology developed, maintained, and controlled by Pindrop.

84. As the foregoing allegations and documents show, AWS also obtains and stores Illinois citizens' biometric identifiers and biometric information in connection with its partnership with Pindrop.

85. When integrated with Amazon Connect, Pindrop's voice authentication technology uses biometric analysis of Illinois citizens' unique voice audio spoken in Illinois and captured by Defendants after reaching into Illinois to determine the identity of Illinois citizen callers.

86. As the foregoing allegations make clear, the unique Biometric Data of Plaintiffs and the Class are matched by AWS to biometric identifiers supplied by Pindrop, creating biometric information.[45] After compiling this biometric information, AWS stores it on its server network.[46]

87. Because of the manner in which Pindrop and Amazon Connect are integrated, both Pindrop and AWS collect and possesses "biometric information" as defined by BIPA.

88. AWS additionally stores biometric templates on its server network as part of the partnership with Pindrop alleged herein.

89. As part of their integrated biometric authentication services, Defendants gathered data about Illinois citizen callers, including their phone numbers.

---

[45] *E.g.*, Integration Guide at 1.
[46] *Id.*

90. Part of the function of the AWS-Pindrop Biometric Data extraction system is to match callers, based on their voice biometrics, with other personally identifiable information, including location.

  5. *Defendants Failed to Comply with BIPA's Requirements in Connection with their Collection, Possession, and Dissemination of Illinois Citizens' Biometric Data*

91. Defendants, at all relevant times, knew that they were extracting biometric voice information from calls originating in Illinois, from Illinois citizens, using Illinois phone numbers. The voice audio that Defendants reached into Illinois to capture consisted of words spoken in Illinois by Illinois citizens.

92. Defendants knew that they were extracting Biometric Data from words vocalized by Illinois citizens in Illinois that Defendants intercepted in Illinois and then converted to Biometric Data using cloud-based technologies.

93. However, Defendants failed to obtain informed written consent prior to collecting this Biometric Data as required by BIPA section 15(b).

94. Further, Defendants have not made available to the public a written policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information, as required by BIPA section 15(a).

95. Defendants have also failed to destroy Plaintiffs' Biometric Data as is required by BIPA section 15(a).

96. As is evident from the facts alleged herein, Defendants also "disclose, redisclose, and disseminate" to and between each other the biometric information and biometric identifiers of Illinois citizens. *See* BIPA Section 15(d). As alleged herein, Defendants collect voice audio by reaching into Illinois via cloud-based technology to obtain audio vocalized in Illinois by Illinois citizens; processes Illinois citizens' audio data, creating Biometric Data; and disseminate and

20

disclose Illinois citizens' unique Biometric Data through their server networks in an ongoing and continuous manner while telephone calls with Illinois citizens are ongoing.

97.     However, Defendants do not obtain consent for this disclosure, redisclosure and dissemination, as required by BIPA section 15(d).

B.      Defendants' Collection, Possession, and Use of *Plaintiffs'* Biometric Data.

98.     Plaintiffs called Amazon Connect call centers used by John Hancock on numerous occasions, from Illinois, using Illinois telephone numbers. When Plaintiffs called the Amazon Connect call centers, the words they spoke were vocalized in Illinois, and captured by Defendants in Illinois.

99.     For example, Plaintiff Christine McGoveran has called these call center(s) regarding her 401(k) account with John Hancock on several occasions, including twice in April and June of 2019.

100.    Similarly, Plaintiff Joseph Valentine called these call center(s) regarding his 401(k) account with John Hancock on multiple occasions.

101.    Likewise, Plaintiff Amelia Rodriguez has called these call center(s) regarding a John Hancock annuity on more than one dozen occasions in recent years, most recently in November 2019.

102.    These call center(s) use Amazon Connect with Pindrop biometric voiceprint authentication.

103.    Because these call center(s) use this technology, they "no longer require[]
customers to have a pin for authentication."[47] Instead they use Pindrop's "voice biometrics" to
authenticate callers.[48]

104.    As is evident from the foregoing allegations, Plaintiff called call centers that had
implemented Defendants' Biometric Data collection technology.

105.    AWS and Pindrop apply their voice biometric technology to every caller to these
call center(s).[49]

106.    Defendants knowingly captured biologically unique voice audio made by
Plaintiffs and other Illinois citizens in Illinois and collected and stored Plaintiffs' Biometric Data
harvested from that biologically unique voice audio.

107.    Pindrop knowingly obtained and analyzed captured voice audio spoken in Illinois
by Plaintiffs and other Illinois citizens to collect and store Plaintiffs' Biometric Data.

C.    **Defendants' Activities in Illinois**

1.  *AWS's Extensive Operations in Illinois and Direct Interactions with Illinois
    Citizens Vocalizing Biologically Unique Sounds in Illinois*

108.    AWS has extensive operations in Chicago, Illinois.[50]

---

[47] Salesforce website, *Why John Hancock Uses Salesforce & Amazon Connect for its Call Center*,https://www.salesforce.com/products/service-cloud/resources/john-hancock-contact-center/, *archived at* https://perma.cc/6PTX-CQHW.

[48] *Id.*

[49] *See, e.g.*, Pindrop Passport + Protect User Guide, https://enterprise.verizon.com/service_guide/secure/passport_and_protect_user_guide.pdf, *archived at* https://perma.cc/6PC4-M7NS, at 3 ("Instant and continuous scoring of *every* call[.]") (emphasis added).

[50] *See, e.g.*, Zumbach, L., *Amazon's Chicago Loop Office Is Doubling Its Head Count, Adding 400 Workers*, https://www.chicagotribune.com/business/ct-biz-amazon-chicago-office-expansion-20190916-2g4gjzjg6jh2ld4mkf6giepzge-story.html, *archived at* https://perma.cc/WWH4-8Z96.

109.    AWS regularly employs and hires personnel in Illinois who work on Amazon Connect and the voice biometric technology at issue in this case.[51]

110.    As of October 28, 2021, AWS advertised that it had 169 full-time job openings in its Chicago office.[52]

111.    For example, AWS advertised the position of "Senior Business Development Manager, AWS Cloud Intelligence" in Chicago, Illinois.[53]

112.    Publicly available information shows that multiple AWS personnel working on Amazon Connect operate out of Illinois. For example, Mike Nolan, a Senior Solutions Architect for Amazon Connect, works out of the Chicago area.[54]

113.    AWS advertises to its customers its "extensive" "global[]" network of data centers.[55]

---

[51] *See, e.g.*, Amazon Jobs Listings, https://www.amazon.jobs/en/locations/chicago?offset=0&result_limit=10&sort=relevant&business_category%5B%5D=amazon-web-services&distanceType=Mi&radius=24km&latitude=&longitude=&loc_group_id=&loc_query=&base_query=&city=&country=&region=&county=&query_options=&, *archived at* https://perma.cc/F6FJ-XL2W; Amazon Jobs Listings, https://www.amazon.jobs/en/jobs/1681526/sr-business-development-manager-aws-cloud-intelligence, *archived at* https://perma.cc/6FNM-53ZM.; Mike Nolan LinkedIn Profile, https://www.linkedin.com/in/mtnolan, *archived at* https://perma.cc/4EHQ-RS7G.
[52] Amazon Jobs Listings, https://www.amazon.jobs/en/locations/chicago?offset=0&result_limit=10&sort=relevant&business_category%5B%5D=amazon-web-services&distanceType=Mi&radius=24km&latitude=&longitude=&loc_group_id=&loc_query=&base_query=&city=&country=&region=&county=&query_options=&, *archived at* https://perma.cc/6QXH-VPUV.
[53] Amazon Jobs Listings, https://www.amazon.jobs/en/jobs/1681526/sr-business-development-manager-aws-cloud-intelligence, *archived at* https://perma.cc/6FNM-53ZM.
[54] Mike Nolan LinkedIn Profile, https://www.linkedin.com/in/mtnolan, *archived at* https://perma.cc/4EHQ-RS7G.
[55] AWS Global Infrastructure, https://aws.amazon.com/about-aws/global-infrastructure/ , *archived at* https://perma.cc/KAF9-HURT.

114.    AWS advertises that two of its data centers are currently located in Chicago, Illinois.[56]

115.    AWS has had at least one data center in Chicago, Illinois since at least 2015.[57]

116.    AWS has at least hundreds of employees at its office in Chicago.[58]

117.    In 2019, AWS and/or parent Amazon.com, Inc. added 70,000 square feet to this location and nearly doubled the number of employees at this office.[59]

118.    AWS employees in Illinois include engineers that maintain cloud servers and programmers that create and monitor software for these servers.

119.    AWS markets and sells its software and services out of its Chicago, Illinois office.

120.    AWS markets and sells Amazon Connect out of its Chicago, Illinois office.

121.    During phone calls from Illinois citizens that are routed by AWS via Amazon Connect, there is a constant and continuous exchange of information between the Illinois citizen and AWS's server network.[60] This continuous exchange of information between AWS and Illinois citizens includes (1) the live audio of the Illinois citizen's communications with the call center agents and auto-attendants, which the Illinois citizen vocalizes in Illinois and Defendants reach into Illinois to capture, as well as (2) the Illinois citizen's vocal and other inputs entered

---

[56] *Id.*

[57] AWS New Chicago Edge Location, https://aws.amazon.com/about-aws/whats-new/2015/12/new-chicago-edge-location-cloudfront-route-53/, *archived at* https://perma.cc/7KVZ-JLN7.

[58] Zumbach, L., *Amazon's Chicago Loop Office Is Doubling Its Head Count, Adding 400 Workers*, https://www.chicagotribune.com/business/ct-biz-amazon-chicago-office-expansion-20190916-2g4gjzjg6jh2ld4mkf6giepzge-story.html, *archived at* https://perma.cc/WWH4-8Z96.

[59] *Id.*

[60] *See, e.g.*, 2020 Amazon Connect Administrator Guide, https://web.archive.org/web/20200507011611/http://docs.aws.amazon.com/connect/latest/adminguide/connect-ag.pdf, *archived at* https://perma.cc/3WZP-8SMY, at 3, 14, 121, 158, 162, 166, 168, 191 (describing AWS's real-time analysis of calls through Amazon Connect).

while navigating AWS's Amazon Connect call center system.[61] This exchange of information takes place *directly* between the Illinois citizen caller and AWS.

122.    This continuous exchange of information that takes place between the Illinois caller and AWS occurs on AWS's network of servers, which includes AWS's Illinois-based servers that are in constant communication with other servers in AWS's network.[62]

123.    Illinois callers communicate *directly* with AWS through Amazon Connect in multiple ways. First Illinois callers dial a number that is routed *directly* to AWS's network of servers, which include those servers in Illinois.[63] Second, Illinois callers enter commands via prompts and interactions with live agents, and AWS *directly* responds to these commands by routing Illinois callers through its system (e.g., by providing information through auto-attendants, or routing Illinois callers to customer service agents who may be located anywhere in the country).[64]

124.    This *direct* interaction between AWS and Illinois citizens continues *after* the Illinois citizen caller initially dials the telephone number he or she is calling and *throughout* the time that the Illinois citizen caller is connected with customer service representatives or automated attendants via Amazon Connect.[65]

> 2.   *Pindrop's Extensive Operations in Illinois and Direct Interactions with Illinois Citizens Vocalizing Biologically Unique Sounds in Illinois*

---

[61] *Id.* at 18 (describing how customers interact with the system by navigating through the system based on commands entered via their phone, or using interactive voice response).

[62] AWS Global Infrastructure, https://www.amazon.com/about-aws/global-infrastructure, *archived at* https://perma.cc/KAF9-HURT.

[63] 2020 Amazon Connect Administrator Guide, https://web.archive.org/web/20200507011611/http://docs.aws.amazon.com/connect/latest/admin guide/connect-ag.pdf at 7, *archived at* https://perma.cc/3WZP-8SMY; AWS Global Infrastructure, https://www.amazon.com/about-aws/global-infrastructure, *archived at* https://perma.cc/KAF9-HURT.

[64] *Id.* at 3, 14, 121, 158, 162, 166, 168, 191.

[65] *Id.* at 31.

125.    Pindrop's General Counsel operates out of Chicago, Illinois.[66]

126.    Pindrop has a sales staff that promotes Pindrop's biometric voice services on a nationwide basis, including in Illinois.[67]

127.    Pindrop actively advertises its services, including its Amazon Connect biometric voice authentication services, in Illinois.[68]

128.    As of October 13, 2021, Pindrop was advertising the position of "Account Executive – Central US" operating out of Chicago, Illinois.[69] Pindrop stated that this position would be responsible for being "the primary pursuer of relationships and closer of deals" pertaining to its voice biometric technology in the central region of the United States.

129.    During phone calls routed via Amazon Connect that involve Pindrop's authentication services, there is a continuous exchange of voice information between Illinois citizens and Pindrop's server network.[70]

---

[66]Nicole Chen LinkedIn Profile, https://www.linkedin.com/in/nicole-chen-bb3905a0?miniProfileUrn=urn%3Ali%3Afs_miniProfile%3AACoAABV91HcBu760Jm-X0QAjTUJcaOoQtLYYrbI&lipi=urn%3Ali%3Apage%3Ad_flagship3_search_srp_people%3B9 6rAsO9mRMS04MNVAxihbQ%3D%3D, *archived at* https://perma.cc/H2QC-F2VE.

[67] https://www.military.com/jobview/Account-Executive-Central-US-Chicago-IL-Pindrop-id-cloud-33c24b2a-4c00-4bc1-9e32-16fd8d4af13f, *archived at* https://perma.cc/9XS3-YBZC; https://www.indeed.com/cmp/Pindrop/jobs?jk=8e6f5742c0f411e0&start=0&clearPrefilter=1, *archived at* https://perma.cc/NT2D-DWZX.

[68] *Id.*

[69] *Id.*

[70] *See, e.g.*, Pindrop Passport + Protect User Guide, https://enterprise.verizon.com/service_guide/secure/passport_and_protect_user_guide.pdf, *archived at* https://perma.cc/6PC4-M7NS at 3 ("Instant and continuous scoring of *every* call[.]") (emphasis added); Pindrop Protect Product Description, https://enterprise.verizon.com/service_guide/secure/pindrop_protect_product_description.pdf, at 10, 13, 15, 16, *archived at* https://perma.cc/6YRM-8XWW; Pindrop Authentication, https://web.archive.org/web/20190309150502/https://www.pindrop.com/solutions/authentication / ("During a caller's interaction with the call center, the IVR [(interactive voice response)] or agent software can confirm the identity of the caller *at any point* via an API [(application programming interface)] request to the Pindrop cloud.") (emphasis added).

130.    This *direct* interaction between Illinois citizens and Pindrop continues *after* the Illinois citizen initially dials the telephone number, and throughout the duration of the Illinois citizen's call.[71]

131.    The Illinois citizen's voice audio spoken in Illinois and captured by Defendants in Illinois is analyzed by Pindrop, which sends the Illinois citizen's Biometric Data to AWS's cloud-based server network, which includes servers located in Illinois and elsewhere.[72]

132.    Because Defendants, through their partnership, reach into Illinois to identify and authenticate Illinois citizen callers based on biologically unique sounds made in Illinois, Pindrop is or should be aware that it is harvesting Biometric Data from Illinois citizens while phone calls from Illinois callers are ongoing.

133.    Pindrop also knows, or should know, that the biometric output of its analysis, i.e., Biometric Data, is transmitted across AWS's server network, which includes AWS's Illinois servers. Pindrop knows, or should know, that the Biometric Data it extracts from Illinois citizens is transmitted across AWS's server network that includes Illinois servers because, for among other reasons, Pindrop's chief technology executive, Chief Technology Officer Collin Davis, was, for nearly eight years immediately prior to joining Pindrop, a technology executive at AWS with, according to Pindrop's CEO, a "voice and security background."[73]

---

[71] *Id.*

[72] *Id.*, *see also* 2020 Amazon Connect Administrator Guide, https://web.archive.org/web/20200507011611/http://docs.aws.amazon.com/connect/latest/adminguide/connect-ag.pdf at 3, 14, 121, 158, 162, 166, 168, 191, *archived at* https://perma.cc/3WZP-8SMY.

[73] *Pindrop Names Former AWS Exec as Chief Technology Officer*, Find Biometrics (June 2, 2021), https://findbiometrics.com/pindrop-names-former-aws-exec-as-chief-technology-officer-706023/, *archived at* https://perma.cc/BL5G-N5B2.

134.     In addition, the Integration Guide shows that the Pindrop-AWS integration operates by means of AWS's "lambda functions."[74] Lambda functions operate on AWS servers.[75] Pindrop must therefore have installed some or all of its voice authentication code onto AWS servers, potentially including those in Illinois.[76]

D.     <u>Defendants Profit from Plaintiffs' Biometric Data</u>

135.     Defendants profit (i.e., "derive benefit")[77] from their collection and possession of Plaintiffs' Biometric Data.

136.     AWS charges fees for and profits from its Amazon Connect services.

137.     AWS profits from offering Pindrop's voiceprint services in conjunction with its Amazon Connect services.

138.     AWS advertises Pindrop integration as a selling point and added value for Amazon Connect customers.

139.     AWS uses Pindrop integration to distinguish AWS's call center services from the call center services offered by AWS's competitors.

140.     AWS bills customers per transaction to verify caller identities.[78]

---

[74] Integration Guide at 1.

[75] AWS Lambda FAQs, https://aws.amazon.com/lambda/faqs/, *archived at* https://perma.cc/NB3L-U3QW. ("Q: Can I access the infrastructure that AWS Lambda runs on? No. AWS Lambda operates the compute infrastructure on your behalf, allowing it to perform health checks, apply security patches, and do other routine maintenance."); https://docs.aws.amazon.com/lambda/latest/dg/welcome.html, *archived at* https://perma.cc/X8VP-9UGT. ("Lambda runs your code on a high-availability compute infrastructure and performs all of the administration of the compute resources[.]").

[76] *See* AWS Lambda@Edge, https://aws.amazon.com/lambda/edge/, *archived at* https://perma.cc/W28Q-LDV6.

[77] Merriam-Webster Dictionary, definition of *profit*, https://www.merriam-webster.com/dictionary/profit, *archived at* https://perma.cc/75X4-WDBT.

[78] AWS Pricing, https://aws.amazon.com/connect/pricing/, *archived at* https://perma.cc/C4C9-8BBB.

141.    Pindrop profits from its biometric voice services, including when those services are used to authenticate Illinois citizens, because it generates revenue by processing, creating, controlling, and disseminating biometric voice data used to authenticate callers.

142.    Pindrop profits from its partnership with AWS and the integration of its biometric voice technology with AWS's Amazon Connect offering because it generates revenue as the result of this partnership and integration.

143.    In addition, Defendants profit from the use of Biometric Data, in violation of BIPA section 15(c).

144.    Pindrop profits from Plaintiffs' Biometric Data by selling Pindrop's Biometric Data analysis and software as a service.[79] Pindrop obtains Plaintiffs' biologically unique voice audio spoken in Illinois, then disseminates the resulting sensitive Biometric Data to its customers, a service for which it is paid. Pindrop does not tell Plaintiffs it is profiting from its harvesting of their biological data, nor does it obtain their consent. Even if it did obtain consent—though it did not—Pindrop's practice of profiting from Illinois citizens' Biometric Data is a BIPA violation. BIPA Section 15(c).

145.    AWS profits from Plaintiffs' Biometric Data because, as alleged herein, it is paid to collect and store this data, which it knowingly does without Plaintiffs' knowledge or consent. Further, AWS advertises the availability of Amazon Connect's integration with Pindrop as a selling point to obtain customers, from whom it generates sales and profits.

146.    In addition to physically hosting Plaintiffs' Biometric Data, AWS supports the Amazon Connect-Pindrop integration in an ongoing fashion to ensure that the AWS and Pindrop

---

[79] Pindrop website homepage, https://www.pindrop.com, *archived at* https://perma.cc/X5XJ-KGLR.

systems continue to work together to analyze Biometric Data. AWS uses this ongoing support as a selling point to attract customers.

147.    Defendants used the features of their services described herein to compete with similar features being offered as part of other call center solutions, giving Defendants a competitive edge that allowed Defendants to profit from the sale of their services.

148.    For the reasons set forth above, among others, Defendants profit from Biometric Data.

149.    Defendants are prohibited from profiting from any "person's or . . . customer's biometric information" because Defendants are "private entit[ies] in possession of a biometric identifier." 740 ILCS 14/15(c). Therefore, the fact that Defendants profit from the Biometric Data they collect in Illinois is unlawful.

E.    Defendants' Conduct Violates BIPA

150.    Plaintiffs' biologically unique voice audio, spoken in Illinois, was captured in Illinois by Defendants, who reached into Illinois via cloud-based technology to obtain it.

151.    Defendants performed biometric analysis to extract Biometric Data from Illinois citizens' biologically unique voice audio spoken in Illinois, which Defendants reached into Illinois to capture.

152.    Though Defendants are aware that they are reaching into Illinois to capture Illinois citizens' biologically unique voice audio spoken in Illinois and conducting biometric voice analysis on Illinois citizens, Defendants do not inform these Illinois citizens that their biometric information and biometric identifiers are being collected and stored.

153.    Defendants do not obtain consent from Illinois citizens, in any form, prior to collecting and storing their voiceprints, let alone obtain written, informed consent, as required by BIPA.

154.    Further, contrary to the requirements of BIPA, neither AWS nor Pindrop have developed any written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information.

155.    Defendants have collected, captured, obtained, and possessed the biometric information and biometric identifiers of Plaintiffs in violation of BIPA.

156.    Defendants have profited from the use of Plaintiffs' biometric information, in violation of BIPA.

157.    Pindrop, after collecting Plaintiffs' and the Class's Biometric Data, disclosed and disseminated that data to AWS.

158.    AWS, after receiving from Pindrop and storing Plaintiffs' and the Class's Biometric Data, redisclosed and disseminated that data to AWS's Amazon Connect customers.

159.    Defendants disseminated, including between each other and their call center clients, the Biometric Data of Plaintiffs, regardless of whether such dissemination was required in order to complete a financial transaction or was required by law, in violation of BIPA.

160.    As alleged herein, Defendants disclosed and re-disseminate Plaintiffs' and Class members' Biometric Data for profit, and otherwise mishandled said Biometric Data.

F.    Plaintiffs Suffered Harm in Illinois

161.    Defendants' failures to comply with BIPA as set forth herein violated Plaintiffs' and other Illinois citizens' privacy rights.

31

162.    The privacy and economic harms caused by the imminent danger posed by Defendants' conduct were suffered by Plaintiffs and other Illinois citizens in Illinois.

163.    Plaintiffs were physically located in Illinois when their biological characteristics were wrongfully captured in violation of BIPA.

164.    The words Plaintiffs spoke when their voiceprints were extracted were spoken in Illinois, and only in Illinois.

165.    Plaintiffs suffered the economic harm alleged herein in Illinois.

166.    Because Plaintiffs and all members of the putative class are Illinois citizens, whose Biometric Data in Defendants' possession was derived from words that Plaintiffs spoke in Illinois, this harm was suffered in Illinois.

167.    Because Plaintiffs were located in Illinois when they interacted directly with Defendants and when Defendants harvested their Biometric Data, Defendants were required under BIPA to, among other things, obtain Plaintiffs' informed written consent in Illinois. Defendants' omission, which violated BIPA, necessarily occurred in Illinois.

168.    Defendants violated BIPA by failing to make required disclosures and obtain permissions in Illinois. Defendants' failure to make the disclosures and obtain the permissions BIPA requires necessarily occurred in Illinois.

169.    The harm to Plaintiffs and the other Illinois citizen class members occurred in Illinois, where Plaintiffs were located, where their voice information was taken, and where Plaintiffs spoke the words that Defendants converted to Biometric Data that they possessed and controlled in violation of BIPA. This harm is ongoing for these and other Illinois citizens.

## VII.   <u>Class Allegations</u>

170.     Plaintiffs seek to represent the following class (the "Class") of similarly situated individuals:

> All Illinois citizens who placed one or more phone calls to, or received one or more phone calls from, an entity using Amazon Connect and Pindrop's voice authentication and/or fraud detection technology, from December 17, 2014 until present.

171.     <u>Numerosity</u>. The Class includes thousands of people, such that it is not practicable to join all Class members into one lawsuit.

172.     <u>Ascertainability</u>. The identity of Class members is ascertainable and identifiable based on Defendants' records.

173.     <u>Commonality</u>. The issues involved with this lawsuit present common questions of law and fact, including:

- whether Defendants collected and/or possessed the Class's "biometric identifiers" or "biometric information";

- whether Defendants properly informed Class members that it captured, collected, used, and stored their biometric identifiers and/or biometric information;

- whether Defendants obtained "informed written consent" (740 ILCS 14/10) to capture, collect, use, and store Class members' biometric identifiers and/or biometric information;

- whether Defendants developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and/or biometric information;

- whether Defendants disseminated Class members' biometric identifiers and/or biometric information;

- whether Defendants profited from Class members' biometric identifiers and/or biometric information;

- whether Defendants used Class members' biometric identifiers and/or biometric information to identify them; and

33

- whether Defendants' violations of BIPA were committed recklessly or negligently.

174.    <u>Predominance</u>. These common questions of law and fact predominate over any individual issue that may arise on behalf of an individual Class member.

175.    <u>Typicality</u>. Plaintiffs, the members of the Class, and Defendants have a commonality of interest in the subject matter of the lawsuit and the remedy sought.

176.    <u>Adequacy</u>. Plaintiffs and counsel will fairly and adequately protect the interests of Class members. Plaintiffs' lead counsel, Schlichter Bogard & Denton, LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g). Schlichter Bogard & Denton has been appointed as lead class counsel in dozens of class actions. Federal courts and others have consistently and repeatedly recognized the firm's unparalleled success:

- "This Court is unaware of any comparable achievement of public good by a private lawyer in the face of such obstacles and enormous demand of resources and finance." Order on Attorney's Fees, *Mister v. Illinois Central Gulf R.R.*, No. 81-3006 (S.D. Ill. 1993).

- "Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients, . . . has invested . . . massive resources and persevered in the face of . . . enormous risks[.]" *Nolte v. Cigna Corp.*, No. 07-2046, 2013 WL 12242015, at *2 (C.D. Ill. Oct. 15, 2013).

- "Of special importance is the significant, national contribution made by the Plaintiffs whose litigation clarified ERISA standards in the context of investment fees. The litigation educated plan administrators, the Department of Labor, the courts and retirement plan participants about the importance of monitoring recordkeeping fees and separating a fiduciary's corporate interest from its fiduciary obligations." *Tussey v. ABB, Inc.,* No. 06-4305, 2015 WL 8485265 at *2 (W.D. Mo. Dec. 9, 2015).

- "Class Counsel's efforts have not only resulted in a significant monetary award to the class but have also brought improvement to the manner in which the Plans are operated and managed which will result in participants and retirees receiving significant savings[.]" *Kruger v. Novant Health, Inc*., No. 14- 208, Doc. 61, at 7–8 (M.D.N.C. Sept. 29, 2016).

- "[Schlichter Bogard & Denton achieved an] outstanding result for the class," and "demonstrated extraordinary resourcefulness, skill, efficiency and determination." *Gordan v. Mass Mutual Life Ins., Co.*, No. 14-30184, Doc. 144 at 5 (D. Mass. Nov. 3, 2016).

- "[Schlichter, Bogard & Denton] pioneered this ground-breaking and novel area of litigation" that has "dramatically brought down fees in defined contribution plans." *Kelly v. Johns Hopkins Univ.*, No. 1:16-CV-2835-GLR, 2020 WL 434473, at *2 (D. Md. Jan. 28, 2020).

- The firm's class action work has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, Wall St. J. (May 15, 2016);[80] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. Times (Mar. 29, 2014);[81] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, Wall St. J. (Feb. 23, 2015);[82] Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. Times (Oct. 16, 2014);[83] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, Wall St. J. (Aug. 25, 2015);[84] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall St. J. (May 18, 2015); [85] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[86] Mark Miller*, Are 401(k) Fees*

---

[80] Anne Tergesen, *401k Fees, Already Low, Are Heading Lower*, Wall Street Journal (May 15, 2016), http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601, *archived at* https://perma.cc/T4KY-QVCT.

[81] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, New York Times (Mar. 29, 2014), http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0, *archived at* https://perma.cc/5ZGL-XCJY.

[82] Liz Moyer, *High-Court Spotlight Put on 401(k) Plans*, Wall Street Journal (Feb. 23, 2015), http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527, *archived at* https://perma.cc/Z878-LH5R.

[83] Floyd Norris, *What a 401(k) Plan Really Owes Employees,* New York Times (Oct. 16, 2014), http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0, *archived at* https://perma.cc/RN8S-9ARU.

[84] Sara Randazzo, *Plaintiffs' Lawyer Takes On Retirement Plans,* Wall Street Journal (Aug. 25, 2015), http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/, *archived at* https://perma.cc/GPR3-2K8F.

[85] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, Wall Street Journal (May 18, 2015), http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139, *archived at* https://perma.cc/2B5A-D4GQ.

[86] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans On Trial*, National Public Radio (Dec. 15, 2014), http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial, *archived at* https://perma.cc/4ANG-CYJS.

> *Too High? The High-Court May Have an Opinion*, Reuters (May 1, 2014);[87]
> Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*,
> Bloomberg (Oct. 2, 2014).[88]

177.   <u>Superiority</u>. A class action is the appropriate vehicle for fair and efficient adjudication of Plaintiffs' and Class members' claims because if individual actions were required to be brought by each member of the Class, the result would be a multiplicity of actions, creating a hardship to the Class, to the Court, and to Defendants.

**COUNT I – VIOLATION OF 740 ILCS 14/15(a)**

178.   Plaintiffs incorporate paragraphs 1 through 177 as though fully realleged herein.

179.   BIPA created statutory duties for Defendants with respect to the possession of the biometric identifiers and biometric information of Plaintiffs and the Class. *See* 740 ILCS 14/15(a).

180.   Defendants violated BIPA section 15(a) by possessing Plaintiffs' and Class members' biometric information, including voiceprints and related biometric information, without creating and following a written policy, made available to the public, establishing and following a retention schedule and destruction guidelines for their possession of biometric identifiers and information.

181.   Defendants' BIPA violations are violations of Defendants' duty of ordinary care owed to Plaintiffs and the Class.

---

[87] Mark Miller, *Are 401(k) fees too high? The high court may have an opinion*, Reuters (May 1, 2014), http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501, *archived at* https://perma.cc/WP3H-YJ3H.

[88] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, Bloomberg Business (Oct. 2, 2014), http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal, *archived at* https://perma.cc/DR9Y-3VJN.

182.     In the alternative, Defendants' BIPA violations were willful and wanton. Defendants knowingly, intentionally and/or recklessly violated the duty they owed to Plaintiffs and the Class.

183.     Plaintiffs incurred injuries that were proximately caused by Defendants' conduct. Through their actions, Defendants exposed Plaintiffs and the Class to imminent threats of serious harm.

184.     Plaintiffs in this Count II hereby request the relief set forth in the Prayer for Relief below, and incorporated as though fully set forth herein.

## COUNT II – VIOLATION OF 740 ILCS 14/15(b)

185.     Plaintiffs incorporate paragraphs 1 through 184 as though fully realleged herein.

186.     BIPA created statutory duties for Defendants with respect to the collection of biometric identifiers and biometric information of Plaintiffs and the Class. *See* 740 ILCS 14/15(b).

187.     Defendants violated BIPA section 15(b)(1) by capturing, collecting, and obtaining Plaintiffs' and Class members' biometric identifiers and biometric information, including voiceprints and related biometric information, without first informing Plaintiffs and Class members that they were collecting this information.

188.     Defendants violated BIPA section 15(b)(2) by capturing, collecting and obtaining Plaintiffs' and Class members' biometric identifiers and biometric information, including voiceprints and related biometric information, without informing Plaintiffs and Class members in writing of the purpose for the collection. Further, Defendants violated BIPA section 15(b)(2) by failing to inform Plaintiffs and Class members in writing of the length of time Defendants would

store and use Plaintiffs' and Class members' biometric identifiers and biometric information, including voiceprints and related biometric information.

189.    Defendants violated BIPA section 15(b)(3) by capturing, collecting and obtaining Plaintiffs' and Class members' biometric identifiers and biometric information, including voiceprints and related biometric information, without first obtaining informed written consent authorizing Defendants to capture or collect Plaintiffs' and Class members' biometric identifiers and/or biometric information.

190.    Defendants' BIPA violations are violations of Defendants' duty of ordinary care owed to Plaintiffs and the Class.

191.    In the alternative, Defendants' BIPA violations were willful and wanton. Defendants knowingly, intentionally, and/or recklessly violated the duty they owed to Plaintiffs and the Class.

192.    Plaintiffs incurred injuries that were proximately caused by Defendants' conduct. Through their actions, Defendants exposed Plaintiffs and the Class to imminent threats of serious harm.

193.    Plaintiffs in this Count II hereby request the relief set forth in the Prayer for Relief below, and incorporated as though fully set forth herein.

## COUNT III – VIOLATION OF 740 ILCS 14/15(c)

194.    Plaintiffs incorporate paragraphs 1 through 193 as though fully realleged herein.

195.    Under BIPA, Defendants owed a duty to Plaintiffs and the Class not to profit from their Biometric Data. *See* 740 ILCS 14/15(c).

196.    Defendants are subject to BIPA section 15(c) because they are "private entit[ies] in possession of a biometric identifier or biometric information."

197.     Defendants violated BIPA section 15(c) by profiting from the possession of Plaintiffs' and Class members' biometric identifiers and biometric information, including voiceprints and related biometric information, by among other things, marketing, selling and performing biometric analysis and storage services that included collecting and possessing Plaintiffs' Biometric Data.

198.     Defendants' BIPA violations are violations of Defendants' duty of ordinary care owed to Plaintiffs and the Class.

199.     In the alternative, Defendants' BIPA violations were willful and wanton. Defendants knowingly, intentionally and/or recklessly violated the duty they owed to Plaintiffs and the Class.

200.     Plaintiffs incurred injuries that were proximately caused by Defendants' conduct. Through their actions, Defendants exposed Plaintiffs and the Class to imminent threats of serious harm.

201.     Plaintiffs in this Count III hereby request the relief set forth in the Prayer for Relief below, and incorporated as though fully set forth herein.

## COUNT IV – VIOLATION OF 740 ILCS 14/15(d)

202.     Plaintiffs incorporate paragraphs 1 through 201 as though fully realleged herein.

203.     Defendants violated BIPA section 15(d) by disclosing, redisclosing, and disseminating Plaintiffs' and Class members' biometric identifiers and biometric information, including voiceprints and related biometric information, without consent, and despite that the disclosure, redisclosure, and dissemination was not necessary to complete any financial transaction requested or authorized by Plaintiffs and Class members.

39

204.     Defendants' BIPA violations are violations of Defendants' duty of ordinary care owed to Plaintiffs and the Class.

205.     In the alternative, Defendants' BIPA violations were willful and wanton. Defendants knowingly, intentionally and/or recklessly violated the duty they owed to Plaintiffs and the Class.

206.     Plaintiffs incurred injuries that were proximately caused by Defendants' conduct. Through their actions, Defendants exposed Plaintiffs and the Class to imminent threats of serious harm.

207.     Plaintiffs in this Count IV hereby request the relief set forth in the Prayer for Relief below, and incorporated as though fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, pray for judgment against Defendants Amazon Web Services, Inc. and Pindrop Security, Inc. as follows:

A.     Certifying this case as a class action, appointing Plaintiffs as Class representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.     Finding that Defendants' conduct violates BIPA;

C.     Awarding actual damages caused by Defendants' BIPA violations;

D.     Awarding statutory damages of $5,000 for each intentional and reckless violation of BIPA pursuant to 740 ILCS 14/20(2), or damages of $1,000 for each negligent violation pursuant to 740 ILCS 14/20(1);

E.     Awarding injunctive and/or other equitable or non-monetary relief as appropriate to protect the Class, including by enjoining Defendants from further violating BIPA pursuant to 740 ILCS 14/20(4);

F.    Awarding Plaintiffs reasonable attorneys' fees, costs, and other litigation expenses pursuant to 740 ILCS 14/20(3);

G.    Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

H.    Awarding such other and further relief as this Court deems appropriate and as equity and justice may require.

## JURY DEMAND

Plaintiffs request trial by jury of all claims asserted herein.

February 17, 2022                          BAYARD, P.A.

                                           */s/ Stephen B. Brauerman*

Andrew D. Schlichter                       Stephen B. Brauerman (#4952)
Joel Rohlf                                 Ronald P. Golden III (#6254)
Alexander L. Braitberg                     600 North King Street, Suite 400
SCHLICHTER BOGARD & DENTON LLP             Wilmington, Delaware 19801
100 South Fourth St., Ste. 1200            (302) 655-5000
St. Louis, MO 63102                        sbrauerman@bayardlaw.com
Phone: (314) 621-6115                      rgolden@bayardlaw.com
Fax: (314) 621-5934
aschlichter@uselaws.com                    *Attorneys for Plaintiffs*
jrohlf@uselaws.com
abraitberg@uselaws.com

41